IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF OREGON

TIME WARNER TELECOM OF OREGON, )
LLC, and QWEST COMMUNICATIONS )
CORP.,                        )          CV 04-1393-PA
                  Plaintiffs, )
                              )          **OPINION**
        v.                    )
                              )
THE CITY OF PORTLAND,         )
                              )
                  Defendant.  )

_____

QWEST CORP.,                  )
                              )          CV 05-1386-PA
                  Plaintiff,  )
                              )
        v.                    )
                              )
THE CITY OF PORTLAND,         )
                              )
                  Defendant.  )          **CONSOLIDATED CASES**

**PANNER, J.**

Plaintiffs Time Warner Telecom of Oregon (TWT), and Qwest
Communications Corp. (QCC) sell telecommunications services in
Oregon. Plaintiffs have franchise agreements with the City of
Portland (the City) that permit plaintiffs to install and operate

1 -- OPINION

telecommunications systems in City streets.

In this action against the City, plaintiffs claim that their franchise agreements violate federal telecommunications law. Plaintiffs also claim that the City illegally competes with them by providing telecommunications services to other governments and public schools.

The parties move for summary judgment. I conclude that the Telecommunications Act of 1996, 47 U.S.C. § 253, preempts the in-kind compensation provisions in TWT's franchise agreement and the most-favored-rate provisions in both franchise agreements. Section 253 does not preempt other provisions of plaintiffs' franchise agreements, or the City's sales of telecommunications services to public schools and other governments.

BACKGROUND[1]

## I.   The City's Telecommunications Network

The City's fiber optic network, the Integrated Regional Network Enterprise (IRNE), provides the City with voice and Ethernet high-speed data transmission services. IRNE also sells Ethernet high-speed data transmission services to other governments and public schools in the Portland area.

In 2000, the City considered creating a fiber optic network

_____

[1]    Statements in the Background are based on the concise statements of facts and the supporting documents submitted in this action and in the companion case, Qwest Corp. v. City of Portland, Civ. No. 05-1386-PA.

2 -- OPINION

that would provide Ethernet service, to increase speed, capacity, and security.  In July 2001, the City received a certificate from the Oregon Public Utility Commission to operate as a competitive local exchange carrier, or CLEC.  (Plaintiffs are also certified as CLECs in Oregon.)  IRNE obtained a telecommunications franchise agreement with the City.  However, IRNE is not a separate legal entity from the City.

Before creating IRNE, the City, working with the Oregon Department of Transportation and the Tri-Metropolitan Transportation District (Tri-Met), formed the Cooperative Telecommunications Infrastructure Committee (CTIC), through an intergovernmental agreement (also known as an IGA).  The CTIC members share resources such as fiber optic cable to help build IRNE's fiber network.  See Or. Rev. Stat. § 190.110(1) (statutory authorization for IGAs).[2]

The City initially invested about $11 million in IRNE.  The City obtained IRNE's physical facilities from different sources.

---

[2]      The statute provides:

In performing a duty imposed upon it, in exercising a power conferred upon it or in administering a policy or program delegated to it, a unit of local government or a state agency of this state may cooperate for any lawful purpose, by agreement or otherwise, with a unit of local government or a state agency of this or another state, or with the United States, or with a United States governmental agency, or with an American Indian tribe or an agency of an American Indian tribe. This power includes power to provide jointly for administrative officers.

For the conduit and aerial runs connecting IRNE's nodes, 43% were
built by the City; 38% were acquired through the City's
membership in the CTIC; 5% were built by the City with other
public entities; 3% were built by the City with private
telecommunications providers; and 11% were obtained from "in-
kind" contributions made by private telecommunications providers
under permits or franchise agreements.  By length, about 9% of
IRNE's fiber runs through underground duct obtained through in-
kind compensation from private carriers.

IRNE does not use any in-kind duct obtained from TWT, QCC,
or Qwest Corp.  (The City previously used conduit from QCC but no
longer does so.)  As part of its franchise agreement with QCC,
the City purchased conduit from QCC for $15,000, which the City
used to transmit IRNE and traffic control signals over the Ross
Island Bridge.

Plaintiffs contend that IRNE should be prohibited from
providing Ethernet high-speed data transmission services[3] to any
entity other than the City itself.  IRNE began offering its
services to non-City governmental customers in mid-2002.  IRNE's
governmental customers sign five-year intergovernmental
agreements with the City, but there are no penalties for ending
service before the agreement date.  For a 100 megabits per second

---

[3]    IRNE provides voice service to the City only, not to
third parties.

(mbps) Ethernet connection, a customer pays IRNE about $530 per month, plus installation and on-site equipment. (A DS-1 line, by contrast, runs at 1.5 mbps.)

Currently, IRNE serves Multnomah County, the State of Oregon, Portland Public Schools, the Port of Portland, the Multnomah Educational Service District, the Metropolitan Service District (Metro), the City of Sherwood, the City of Hillsboro, the City of Gresham, and the U.S. Army Corps of Engineers. IRNE links the State Office Building, Portland Public Schools, the Multnomah Educational Service District, and Metro to a central location where high-speed connections may be made to any internet service provider. IRNE connects Multnomah County and the Port of Portland to the 911 Emergency Center and to the Portland Police headquarters and Multnomah County offices.

IRNE does not provide telecommunications services to any non-governmental third parties. The City does not solicit sales for IRNE. Counsel for the City stated at oral argument that the City has no plans ever to offer services to non-governmental entities.

IRNE's governmental customers have found that IRNE provides improved telecommunications services at a competitive price. IRNE allows participating government agencies to share critical information, such as law enforcement files, efficiently and securely.

5 -- OPINION

The City states that it received about $83,000 in revenue from IRNE for the last fiscal year. Plaintiffs dispute that figure, contending that the City should include revenue from the Institutional Net or I-NET, which provides high-speed transmission services to local schools and government agencies. The I-Net is authorized by statute. See 47 U.S.C. § 531(b) & (f).

The City states that the cable company Comcast Corp. (Comcast) built and owns the I-Net. Comcast did not use any in-kind underground duct or intergovernmental fiber in constructing the I-Net. The City and Comcast agreed that the City will manage the I-Net, while Comcast owns and operates the network itself. According to the City, I-Net generated about $1.055 million in revenues for the last fiscal year, of which $650,000 went to the City and $405,000 went to Comcast. I-Net customers pay about $554 per month for each primary port per location. Out of that monthly payment, the City receives $314 for management and maintenance services, while $240 goes to Comcast for transmission over its system.

The City states that IRNE's customers generally purchase either an IRNE connection or an I-Net connection. Only the Portland Public School District, the Multnomah Educational Services District, and Multnomah County purchase both IRNE and I-Net connections. The I-Net connects 89 schools for Portland

Public Schools and 72 schools for the Multnomah Educational
Service District.

I conclude that the City may properly exclude I-Net revenue
from IRNE's gross revenues.  However, even if the I-Net revenue
should be included, that would not change my legal rulings.

## II.  The Telecommunications Market in Portland

Twenty-one telecommunications providers, including
plaintiffs, sell services in the Portland area under City
franchise agreements or permits.  Some franchise agreements,
including TWT's, permit ubiquitous access to the City's rights of
way, while other agreements, including QCC's, authorize the use
of specific routes.

The City has never denied a franchise application to provide
telecommunications services.  No potential telecommunications
provider has ever withdrawn an application because of the
proposed terms of a franchise agreement with the City.

### A.  Time Warner Telecom (TWT)

TWT sells telecommunications services in more than forty
metropolitan areas across the United States.  TWT owns and
operates a telecommunications system in Portland.

According to the City, TWT had gross revenues of $2.2
million in fiscal year (FY) 2002-2003; $3.7 million in FY 2003-
2004; and $4.6 million in FY 2004-2005.  Under the franchise
agreement, TWT paid the City fees equal to 5% of TWT's gross

revenues:  $110,225 in 2002-03; $183,579 in 2003-04; and $231,357 in 2004-05.  TWT will neither confirm nor deny the accuracy of the City's figures because TWT uses a different fiscal year than the City.

TWT's franchise agreement requires that TWT provide the City with in-kind underground duct if requested.  TWT has not provided any duct to the City.

### B.  Qwest Communications Corp. (QCC)

QCC entered the Portland market in the 1990s, providing long-distance services.  QCC had no revenues in Oregon in 2001 and 2002.  QCC's revenues for one quarter of 2003 were $4.7 million, and its revenues for 2004 were $15.2 million.  QCC does not track its revenue separately for the Portland metropolitan area.

QCC and the City entered into a franchise agreement in 1997 that gave QCC the right to run its facilities from the west end of the Ross Island Bridge to downtown Portland.  QCC pays the City an annual fee per foot of use, adjusted for inflation. According to the City, the most recent fee was about $3 per foot, for a total of about $38,000.

### STANDARDS

The court must grant summary judgment if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  If the

moving party shows that there are no genuine issues of material
fact, the nonmoving party must go beyond the pleadings and
designate facts showing an issue for trial.  Celotex Corp. v.
Catrett, 477 U.S. 317, 322-23 (1986).

## DISCUSSION

### PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

### I.  Standing

The City contends that plaintiffs lack standing to challenge
IRNE.  To establish standing, plaintiffs must show that they have
suffered an injury in fact because of the City's conduct, and
that the injury would be redressed by a decision in their favor.
See On the Green Apartments L.L.C. v. City of Tacoma, 241 F.3d
1235, 1239 (9th Cir. 2001).  An injury in fact is "'an invasion
of a legally protected interest which is (a) concrete and
particularized, and (b) actual or imminent, not conjectural or
hypothetical.'"  Lee v. State of Oregon, 107 F.3d 1382, 1387 (9th
Cir. 1997) (quoting Lujan v. Defenders of Wildlife, 504 U.S. 555,
560 (1992)).  Plaintiffs also must satisfy "the prudential
component of standing; that is, [their] 'complaint must "fall
within the zone of interests to be protected or regulated by the
statute or constitutional guarantee in question."'"  On the Green
Apartments, 241 F.3d at 1239 (citations omitted).

Here, the City contends that even if this court grants
plaintiffs the relief they seek, plaintiffs could not compete

with IRNE.  I conclude, however, that plaintiffs have made a
sufficient showing of standing because they are within the zone
of interests protected by § 253(a).

## II.  Preemption

### A.  Section 253(a)

Section 253(a) prohibits state and local governments from
imposing regulations that could bar the provision of a
telecommunications service:

> No State or local statute or regulation, or other State
> or local legal requirement, may prohibit or have the
> effect of prohibiting the ability of any entity to
> provide any interstate or intrastate telecommunications
> service.

47 U.S.C. § 253(a).  Section 253(a) preempts regulations that
prohibit or <u>may</u> prohibit the provision of a telecommunications
service.  <u>See</u> <u>Qwest Communications Inc. v. City of Berkeley</u>, 433
F.3d 1253, 1256-57 (9th Cir. 2006) (<u>City of Berkeley</u>).  A
regulation could violate § 253(a) even if the regulation has not
actually prevented the provision of any telecommunications
service.  <u>See</u> <u>Qwest Corp. v. City of Portland</u>, 385 F.3d 1236,
1241 (9th Cir. 2004) (<u>City of Portland</u>), <u>cert. denied</u>, 125 S. Ct.
2300 (2005).

The court's analysis of a challenged regulation should not
be completely divorced from economic reality.  The court should
consider a challenged regulation's actual economic effect on a
carrier's ability to provide telecommunications services.  As

10 -- OPINION

Magistrate Judge Ashmanskas noted in addressing a similar
challenge, "what other benchmark would be used to determine
whether a particular provision may have the effect of prohibiting
a telecommunications provider from entering the market?"  City of
Portland v. Electric Lightwave, Inc., Civ. No. 03-538-AS, slip
op. at 29 (D. Or. May 5, 2005) (ELI).  I agree with Judge
Ashmanskas that although a provider "is not required to make an
actual showing that it is effectively prohibited from providing
telecommunications services, it must at least demonstrate that
the requirement is or may be a 'barrier to entry into the City's
telecommunications market.'"  ELI, slip op. at 20 (quoting City
of Portland, 385 F.3d at 1241).

     If a plaintiff challenges more than one regulation, the
court must consider the effect of the regulations both separately
and in combination.  See City of Auburn v. Qwest Corp., 260 F.3d
1160, 1176 (9th Cir. 2001) (City of Auburn).  Plaintiffs bear the
burden of showing that § 253(a) applies.

     **B.  Safe Harbor under § 253(b) and (c)**

     If, and only if, a regulation violates § 253(a), the court
must then determine whether the regulation could be rescued by
the statute's safe harbor provisions, § 253(b) and (c).

          **1.  Safe Harbor under § 253(b)**

     The parties dispute whether the safe harbor provision of §
253(b) could apply here.  On its face, § 253(b) applies to state,

11 -- OPINION

rather than local, legal requirements:

> (b) State regulatory authority
>
> Nothing in this section shall affect the ability of a
> State to impose, on a competitively neutral basis and
> consistent with section 254 of this title, requirements
> necessary to preserve and advance universal service,
> protect the public safety and welfare, ensure the
> continued quality of telecommunications services, and
> safeguard the rights of consumers.

The Tenth Circuit has held that § 253(b) applied to states and

not to local governments. See Southwestern Bell Wireless v.

Johnson County Bd. of County Comm'rs, 199 F.3d 1185, 1192 (10th

Cir. 1999). I conclude, however, that when "a state specifically

delegated the state authority to its local governments," § 253(b)

does apply to local governments. Cox Commc'ns, PCS, L.P. v. City

of San Marcos, 204 F. Supp. 2d 1260, 1264 (S.D. Cal. 2002)

(citation omitted).

Here, Portland City Charter gives the City, within its

jurisdiction, the equivalent of the legislative powers of the

State of Oregon. See Sims v. Besaw's Café, 165 Or. App. 180,

184-85, 997 P.2d 201, 203-04 (2000) (en banc). The State of

Oregon allows cites to operate telephone systems: "When

authorized by its charter . . . , a city may purchase, build,

own, operate and maintain telephone or telegraph systems within

or without its boundaries, for the benefit and use of its

inhabitants at cost or for profit." Or. Rev. Stat. § 225.110.

More generally, the State authorizes the City to own property for

any "general benefit and use of the people within or without the city."  Or. Rev. Stat. § 223.005(2).  I conclude that the City is entitled to the protection of § 253(b).

### 2.  Safe Harbor under § 253(c)

Section 253(c) provides:

> Nothing in this section affects the authority of a State or local government to manage the public rights-of-way or to require fair and reasonable compensation from telecommunications providers, on a competitively neutral and nondiscriminatory basis, for use of public rights-of-way on a nondiscriminatory basis, if the compensation required is publicly disclosed by such government.

47 U.S.C. § 253(c).  "This 'safe harbor' clause permits state and local government control over the use of the rights-of-way, so long as the control is management of the rights-of-way itself and not control of the telecommunications companies with facilities in the rights-of-way."  City of Berkeley, 433 F.3d at 1256 (citing City of Auburn).

### 3.  Safe Harbor Provisions as Affirmative Defenses

The Ninth Circuit has not determined whether the safe harbor provisions of § 253 create affirmative defenses, or whether the burden of proof remains on the plaintiff to show that § 253 applies.  Compare BellSouth Telecommunications, Inc. v. Town of Palm Beach, 252 F.3d 1169, 1187-88 (11th Cir. 2001) (§ 253(c) is an affirmative defense); Qwest v. City of Santa Fe, 380 F.3d 1258, 1272 n.10 (10th Cir. 2004) (accord) with Sprint Telephony PCS, L.P. v. County of San Diego, 377 F. Supp. 2d 886, 897 (S.D.

13 -- OPINION

Cal. 2005) ("Consideration of section 253(c) is a necessary part of the preemption analysis, not a defense."). For this opinion, I assume that if plaintiffs show that a legal requirement violates § 253(a), the City then has the burden of showing that the requirement is rescued by § 253(b) or (c).

## III.  Applying § 253

### A.  The City's Operation of IRNE

Plaintiffs contend that the City exploits its power over the rights of way to compete illegally with private carriers in the market for governmental customers. Plaintiffs claim that the City's use of in-kind compensation from private carriers to create IRNE, and the City's intergovernmental agreement allowing the City to share resources with other governments, show that the City competes unfairly in operating IRNE. Plaintiffs contend that they cannot match the City's prices for telecommunications services because the City's expenses are artificially low.

The City responds that plaintiffs brought this action to stifle a successful competitor, using a statute that was enacted specifically to promote competition. See City of Rancho Palos Verdes v. Abrams, 125 S. Ct. 1453, 1455 (2005) (Congress enacted Telecommunications Act of 1996 "to promote competition and higher quality in American telecommunications services and to 'encourage the rapid deployment of new telecommunications technologies.'") (citation omitted). The City contends its use of City resources

14 -- OPINION

to create and operate IRNE are not "regulations" or "legal requirements" subject to preemption under § 253(a).

Before addressing the merits of plaintiffs' challenge to IRNE, it is important to note that the City is permitted to compete with private carriers in the market for telecommunications services. The Federal Communications Commission (FCC) has encouraged the "participation of municipally owned entities in the telecommunications business [to] "'further the goal of the 1996 Act to bring the benefits of competition to all Americans . . . .'" Nixon v. Missouri Municipal League, 541 U.S. 125, 131 (2004) (citation omitted). The wisdom of permitting local governments to compete with private carriers is not at issue here.

Plaintiffs contend that § 253(a) preempts the City's operation of IRNE, including the City's intergovernmental agreements to share resources with the State of Oregon and other government entities. Plaintiffs contend that "private carriers, such as TWT and QCC, have been unable to compete against the City in the City's chosen key market -- government educational institutions -- because of the City's below market prices which the carriers themselves subsidized." Pls.' Mem. in Supp. at 41.

The problem with plaintiffs' preemption argument is that § 253(a) does not apply to IRNE. Section 253(a) preempts any "State or local statute or regulation, or other State or local

legal requirement" that may have the effect of prohibiting the provision of a telecommunications service.  Plaintiffs fail to show that IRNE regulates plaintiffs or imposes legal requirements on plaintiffs.  Although the City used in-kind compensation to create IRNE, none of the in-kind compensation came from plaintiffs.  See Qwest Corp. v. City of Surprise, 434 F.3d 1176, 1180 (9th Cir. 2006) (City of Surprise) ("Qwest suffers no injury when its competitors are subjected to additional, costly requirements").  In any event, the in-kind compensation does not form a significant part of IRNE's network.

Plaintiffs also contend that the City's intergovernmental agreements violate § 253(a).  I agree with the City that plaintiffs may not attack the intergovernmental agreements because the other parties to those agreements are not parties in these consolidated actions.  Even if plaintiffs could challenge the intergovernmental agreements, plaintiffs have failed to show how the agreements may prohibit the provision of a telecommunications service.  The agreements simply allow the governments to share their resources, just as private companies may enter joint ventures or partnerships.

Even if the City's operation of IRNE could be construed as a regulation or legal requirement subject to preemption under § 253(a), plaintiffs have not shown that IRNE has prevented plaintiffs or other private carriers from providing any

16 -- OPINION

telecommunications services.  Plaintiffs have not shown why the
City's sales to other governments may have the effect of
prohibiting the provision of a telecommunications service.  As I
understand plaintiffs' argument, plaintiffs contend that if a
government customer chooses to purchase telecommunications
services from IRNE, plaintiffs or other private carriers have
been "prohibited" from providing a telecommunications service to
that customer.  However, the loss of a potential customer is not
equivalent to a legal restriction preventing the provision of a
telecommunications service.  As the City points out, while
plaintiffs challenge IRNE's prices as artificially low,
plaintiffs do not attempt to show why their own prices are higher
than IRNE's.

Plaintiffs also have not shown why governmental customers
constitute a relevant market, rather than a small fraction of the
Portland market as a whole.  Plaintiffs seem to view IRNE as a
competitive juggernaut against which they are hapless victims.
However, I accept the testimony of the City's expert, Alan
Pearce, who stated that IRNE is not significant in the Portland
market, that IRNE has "no market power, no opportunity to
monopolize, no opportunity to predatory price. . . . It can't
behave anticompetitively because it isn't big enough or powerful
enough.  It doesn't have deep pockets." Pearce Dep., 260-61,
quoted in City's Mem. in Opp. 18.

17 -- OPINION

Plaintiffs seem to treat § 253 as an antitrust statute that targets only state and local governments. Plaintiffs argue that the City, because of its status as a local government, has unfair competitive advantages over private carriers. It's true that unlike private carriers, the City may enter into intergovernmental agreements to share resources with other governments. (Of course, as noted, private carriers may enter into similar arrangements with other private carriers.) The City controls the public rights of way, and has the authority to grant franchises. However, federal law allows local governments to compete with private carriers, even though most if not all local governments enjoy these potential competitive advantages. Also, as the City points out, private carriers have their own competitive advantages over local governments.

I agree with plaintiffs that a local government may face a conflict of interest when it competes with private carriers in the market for telecommunications services. For example, a local government could abuse its authority to grant franchises to benefit itself as a competitor. See Nixon, 541 U.S. at 131 ("in a business substantially regulated at the state level, regulation can turn into a public provider's weapon against private competitors"). However, plaintiffs have not presented evidence of such conduct here.

Plaintiffs have not shown how the City's operation of IRNE

"may prohibit or have the effect of prohibiting the ability of any entity to provide any interstate or intrastate telecommunications service."  My conclusion is limited to the particular circumstances here, in which the City is selling telecommunications services only to other governments and public schools, and not to any private parties.

Even if the City's operation of IRNE could be construed as violating § 253(a), IRNE would be rescued by § 253(b), one of the two safe harbor provisions.  Under § 253(b), the City may impose "on a competitively neutral basis . . . requirements necessary to . . . protect the public safety and welfare."

IRNE links various government offices, including law enforcement and emergency services, using secure, high-speed technology.  IRNE connects transportation agencies, allowing better traffic control and responses to emergencies.  IRNE provides public schools with low cost, high-speed telecommunications services.  These uses show that IRNE helps to protect "public safety and welfare."  (The State of Oregon, through the Department of Transportation, benefits directly from IRNE.)  Even if IRNE runs afoul of § 253(a), it is saved by § 253(b).

## B.  Applying § 253 to Plaintiffs' Franchise Agreements

Plaintiffs contend that § 253(a) preempts provisions of their franchise agreements with the City.

19 -- OPINION

### 1.    Franchise Provisions Are "Legal Requirements"

The City contends that § 253(a) does not apply to franchise agreements because the agreements are not "regulations" or "legal requirements," but contracts voluntarily executed by the parties. Plaintiffs respond that the City approves each franchise agreement through a City ordinance.

I conclude that a private carrier may challenge a franchise agreement under § 253.  Otherwise, a local government might try to shield an onerous restriction from challenge by placing the restriction in the franchise agreement rather than imposing it through a regulation.

I also conclude that plaintiffs are not estopped from challenging the franchise agreements, and that section 19.9 of QCC's franchise agreement does not limit QCC to challenging only section 3.1 of its franchise agreement.

### 2.    In-Kind Compensation Provisions

Plaintiffs challenge the provisions in their franchise agreements requiring them to make in-kind contributions to the City.

### a.    TWT's In-Kind Provisions

TWT's agreement provides:

Section 9.  USE OF NETWORK CAPACITY AND DUCTS BY CITY.

   9.1 Upon written request from the City, Grantee
shall provide conduit and/or lit optical fiber network
connections to the City, for municipal purposes.

9.2 (A) <u>Ducts</u>.  In the case of any new
construction by the Grantee in the Streets, after prior
notice to and upon written request from the City,
Grantee shall install for the City one duct for each
duct that Grantee installs, up to four ducts, or one
single four-inch (4") duct, for municipal purposes.
The cost of such ducts may not be deducted from
Franchise fees payable to the City, or otherwise be
charged to the City.  Upon completing installation and
construction of the ducts in the City Streets, Grantee
shall submit to the City a deed or other form of
ownership documentation for such ducts.

(B) (1)  <u>City Use of Surplus Ducts or Conduits</u>.
The City may install or affix, and maintain wires and
equipment for municipal purposes within any of
Grantee's surplus ducts or conduits, as defined in
Section 12.1(E).  Grantee shall not be responsible for
any damage resulting to the wires or property of the
City occurring as a result of the City's use of
Grantee's surplus ducts or conduits.  The City shall
not have access to Grantee's surplus ducts and conduits
without Grantee's prior approval, except in the event
of an emergency requiring that the City obtain
immediate access to those conduits or ducts.  In such
an emergency, the City shall exercise its best efforts
to notify the Grantee as soon as possible of the
emergency and the City's need for immediate access.
All work to attach, install, and/or maintain City wires
and equipment in such surplus ducts shall be performed
by Grantee, at City expense, at a charge not to exceed
Grantee's direct incremental costs of material and
labor plus ten percent (10%).  Grantee's charges for
attaching, install or maintaining such City wires and
equipment may be deducted from Franchise fees payable
to the City, or may otherwise be separately charged by
the Grantee to the City.

(2)  The value of the City's use of Grantee's
surplus conduits or ducts shall not be charged to the
City, or be deducted from Grantee's Franchise fee, or
other fees or charges payable to the City.

The TWT franchise agreement defines "municipal purposes" to

exclude "(1) the sale or lease of telecommunications services to

third parties; (2) the transfer of any rights by the City to

21 -- OPINION

third parties for the purpose of providing the City with access
to interexchange carriers . . . ."  TWT Franchise Agreement,
§ 9.4.

I conclude that the in-kind provisions of TWT's agreement
are preempted by § 253(a).  See ELI, slip op. at 29.  The in-kind
provisions are open-ended, requiring that TWT provide conduit or
fiber optic network connections "[u]pon written request from the
City."  Because the in-kind provisions leave so much to the
City's discretion, TWT cannot plan for the cost of providing in-
kind compensation.  The provisions are preempted even though, as
in ELI, the City has not actually obtained any in-kind
compensation from TWT.

I also conclude that the in-kind provisions in TWT's
agreement are not rescued by § 253(c).  A properly limited in-
kind compensation provision could be considered to be "fair and
reasonable compensation from telecommunications providers . . .
for use of public rights-of-way."  47 U.S.C. § 253(c).  However,
the possible in-kind compensation the City may demand from TWT is
not limited.

### b.  QCC's In-Kind Provisions

QCC's agreement provides:

Section 9.  CITY USE OF DUCTS.

9.1  Ducts Provided to City in City Streets.  Grantee
shall install for the City two two-inch ducts to be
reserved for municipal purposes as part of Grantee's
construction in City Streets as shown on the map

22 -- OPINION

attached to this Franchise as Exhibit A.  Upon
completing installation and construction of the two
two-inch ducts in the City Streets, Grantee shall
submit to the City a deed or other form of
documentation indicating City ownership of such ducts.

9.2  <u>Ducts Provided to City Across Ross Island Bridge</u>.
Grantee shall install two one and one-quarter inch
ducts for the City across the Ross Island Bridge.  In
consideration for providing these ducts to the City,
Grantee may take a one-time credit against the
Franchise fees of up to Fifteen-thousand Dollars
($15,000) of Grantee's actual and direct material costs
of providing the ducts to the City.  Upon submitting
documentation to the City that it is taking this credit
against compensation paid, or to be paid, under Section
3.1 of this Franchise, Grantee shall also
simultaneously submit to the City a deed or other form
of ownership documentation for the ducts.

QCC's franchise agreement defines "municipal purpose" to exclude

"the sale or lease of Telecommunications Services to third

parties."

Unlike the in-kind provisions in TWT's agreement, the in-

kind provisions in QCC's agreement are not open-ended.  Instead,

they are a one-time requirement.  The in-kind provisions do not

give the City broad discretion to require additional in-kind

compensation.

Plaintiffs have not shown that in-kind compensation

provisions are per se preempted. As the City notes, local

governments for many years have used similar in-kind compensation

provisions in utility franchise agreements.  I conclude that the

in-kind provisions in QCC's franchise agreement do not run afoul

of § 253(a).  Even if the in-kind provisions did violate §

23 -- OPINION

253(a), I would conclude that they are rescued by § 253(c) as
reasonable compensation for use of the City's rights of way.

### 3.   TWT's Franchise Fee Based on Gross Revenues

TWT's franchise agreement with the City requires that TWT
pay annual fees based on 5% of TWT's gross revenues.  The City
places proceeds from the gross revenue fee in the City's general
fund.

I conclude that this court lacks subject matter jurisdiction
over TWT's challenge to the 5% gross revenue fee because the fee
is a tax.  Even if the gross revenue fee is subject to
preemption, it survives as reasonable compensation for use of the
City's rights of way.

### a.   The Gross Revenue Fee is a Tax

The Tax Injunction Act, 28 U.S.C. § 1341, forbids federal
district courts from enjoining, suspending, or restraining "the
assessment, levy or collection of any tax under State law where a
plain, speedy and efficient remedy may be had in the courts of
such State."  To determine whether a particular charge is a tax,
the court should consider "(1) the entity that imposes the
charge; (2) the parties upon whom the charge is imposed; and (3)
whether the charge is expended for general public purposes, or
used for the regulation or benefit of the parties upon whom the
assessment is imposed."  City of Surprise, 434 F.3d at 1183
(citing Bidart Bros. v. California Apple Comm'n, 73 F.3d 925, 931

24 -- OPINION

(9th Cir. 1996)).

Applying the Bidart test, I conclude that the 5% gross revenue fee (regardless of its label) is a tax because the City places proceeds from the fee in its general fund.  When "an ordinance requires that a telecommunications provider pay a percentage of its gross revenues to the municipality, and the revenue from that charge is directed to the municipality's general fund, the charge constitutes a tax."  City of Surprise, 434 F.3d at 1184.  If TWT's challenge to the gross revenue fee was successful, it would "reduce the flow of [City] tax revenue."  Id. (citing May Trucking Co. v. Oregon Dep't of Transp., 388 F.3d 1261, 1267 (9th Cir. 2004)).

Even if the Tax Injunction Act did not deprive this court of subject matter jurisdiction, the Telecommunications Act itself provides that taxes are not subject to preemption.  See City of Surprise, 434 F.3d at 1183 n.3.

### b.  The Gross Revenue Fee Is Not Preempted

Even if the gross revenue fee is not a tax, it is not preempted by § 253.  Plaintiffs have failed to show that the 5% fee may have the effect of prohibiting the provision of any telecommunications service.  The record indicates that there are more than twenty carriers in the Portland area, some of which are subject to the 5% gross revenue fee.  See ELI, slip op. at 22 ("at least 13 other telecommunications companies are paying an

identical 5% fee").

Even if the 5% fee could be considered to violate § 253(a), I agree with Judge Ashmanskas that the fee is rescued by § 253(c) because it is "fair and reasonable compensation" for TWT's use of the City's rights of way. <u>ELI</u>, slip op. at 45-52. I adopt Judge Ashmanskas's extensive and thoughtful analysis of this issue.

### 4.    QCC's Franchise Fees Based on Usage

QCC's franchise agreement, at section 3.1, requires that QCC pay annual fees based on per-foot usage, adjusted for inflation. The most recent rate was about $3 per foot, which amounted to about $38,000 for the past year.

Plaintiffs contend that the fee provision violates § 253(a) because the fee is not tied to the actual cost of using the rights of way. I disagree. Plaintiffs have not shown that the $3 per foot fee may have the effect of prohibiting the provision of any telecommunications service. To put this issue in perspective, QCC paid the City a franchise fee of about $38,000 for the last fiscal year. In the most recent year for which figures are available, QCC earned more than $15 million in revenues from sales in the Portland area.

Second, even if the usage fee violates § 253(a), it is rescued by § 253(c), which allows cities "to require fair and reasonable compensation from telecommunications providers." The key word is "compensation." I conclude from the legislative

history and the wording of the statute that "compensation" in
this context is not limited to the actual cost of using the
rights of way.  Again, I adopt Judge Ashmanskas's well-reasoned
analysis of this issue.  See ELI, slip op. at 45.

Plaintiffs argue that the City charges carriers different
fees for using the rights of way.  Plaintiffs contend that Qwest
Corp. pays 7% of exchange access revenue, which results in a fee
that is less than 5% of Qwest Corp.'s gross revenues.

The City is not required to impose identical franchise fees
on private carriers that use the City's rights of way
differently.  See Cox Communications PCS, L.P. v. City of San
Marcos, 204 F. Supp. 2d 1260, 1269-70 (S.D. Cal. 2002).  The
City's agreement with Qwest Corp., the incumbent service
provider, is different from its agreement with QCC, so there is a
valid reason to treat the two carriers differently.

### 5. Most Favored Rate Provisions

Both franchise agreements contain provisions, found at
section 3.2 of the agreements, that require the franchisee to
provide telecommunications services to the City on request at the
franchisee's "most favorable rate offered at the time of the
request charged to a similar user within Oregon for a similar
volume of service . . . ."

Judge Ashmanskas concluded that a nearly identical "most-
favored-rate" provision was preempted because "there are no

restrictions on the extent or amount of services that may be required by the City.  Rather, pursuant to section 3.2, it appears that ELI must be prepared at all times to provide the City with whatever service [it requests], at a most-favored-rate."  ELI, slip op. at 23.

I agree with Judge Ashmanskas that the most-favored-rate provisions at issue here allow the City too much leeway and therefore violate § 253(a).  I also agree with Judge Ashmanskas that the most-favored-rate provisions are not saved by § 253(c) because the provisions are not sufficiently related to the City's management of its rights of way.  ELI, slip op. at 38.

### 6.  Non-Monetary Franchise Provisions

Plaintiffs challenge non-monetary franchise provisions and sections of the Portland City Charter and the Portland City Code.

Plaintiffs challenge section 16 of their franchise agreements, which gives the City discretion to revoke or amend the franchise; section 18, which gives the City discretion to renew a franchise; and section 1.3, requiring that the franchisee unconditionally accept terms of the franchise.

I conclude that the challenged non-fee requirements in plaintiffs' franchise agreements are not preempted.  Franchise agreements are mutually binding contracts between the City and the franchisee.  The City's discretion in enforcing these provisions is limited by the implied duty of good faith and fair

dealing, which Oregon law implies in every contract.  See ELI,
slip op. at 31.  As Judge Ashmanskas noted, the franchise
agreements requires that the City and the franchisee comply with
all applicable state and federal law.  The City must comply with
the Federal Telecommunications Act when it decides, for example,
whether to renew a franchise (section 18).

     None of the challenged non-fee provisions violates § 253(a).
Section 16 of the franchise agreements includes monitoring,
enforcement, and penalty provisions.  Because the City may
require a franchise agreement to use the City streets, it follows
that the City is entitled to enforce the terms of the franchise
agreement.  Otherwise, a franchisee could breach a franchise
agreement with impunity.  Section 16 itself includes checks on
the City's ability to apply it, such as a requirement that the
City not impose forfeiture or penalties if there is a good faith
dispute, and a requirement that the franchisee receive notice and
an opportunity to cure the alleged breach.

     Section 1.3 of the franchise agreements provides that the
franchise agreement is effective only if the franchisee
unconditionally accepts it within thirty days of its offer, and
that the franchise is null and void if it is not accepted.  I
agree with the City that this provision is in accord with black
letter contract law, and is not a prohibition.

     The challenged City Charter provisions include section 2-

107, which allows the City to punish violations of a franchise
agreement; and section 10-211, which allows the City to place
"conditions or restrictions" in a franchise agreement.  These
general provisions do not violate § 253(a).  The City Charter
provisions were not adopted specifically for telecommunications
providers.  In City of Portland, the Ninth Circuit expressed
doubt whether § 253 applied to regulations or legal requirements
"that are not specific to the telecommunications process."  385
F.3d at 1242.  I conclude that § 253(a) does not apply to these
Charter provisions.

Even if the non-fee provisions violate § 253(a), they are
rescued by the safe harbor provision of § 253(c) because they
directly relate to the City's management of its rights of way.
Section 1.3 requires that the franchisee execute the franchise
agreement before the franchisee may occupy the City's streets.
Section 16 sets remedies for breaches of the franchisee's
obligations in using the streets.  Section 18 sets procedures for
the expiration of the franchisee's authorization to use the
rights of way.

### 7.  Severability

I conclude that the preempted provisions are severable from
the franchise agreements.  Both franchise agreements contain
severability provisions.  See TWT Franchise Agreement, § 20.2;
QCC Franchise Agreement, § 19.2.  I conclude that the preempted

30 -- OPINION

provisions are severable because the franchise agreements remain
enforceable without those provisions.  See ELI, slip op. at 53-
54.

## IV.   Section 1983 Claim Based on § 253

Plaintiffs bring a claim under 42 U.S.C. § 1983 based on the
City's violations of 47 U.S.C. § 253.  I grant the City's motion
for summary judgment on this claim.

The Ninth Circuit has not decided whether § 253 creates a
private remedy under § 1983.  In Qwest v. City of Santa Fe, 380
F.3d 1258, 1265-67 (10th Cir. 2004) (Santa Fe), the Tenth Circuit
held that neither the text nor the structure of 47 U.S.C. § 253
indicated an intent to create a private right of action under §
1983.  The Tenth Circuit reasoned that "the language of the
statute is not focused on the benefits granted to the
telecommunications providers.  Instead the statute focuses on
restricting the type of telecommunications regulations a local
authority may enforce."  380 F.3d at 1265.

I agree with the Tenth Circuit's reasoning in Santa Fe that
§ 253 should not be construed to create a private right of action
under § 1983.

## V.   Commerce Clause Claim

Plaintiffs contend that the City's operation of IRNE
violates the Commerce Clause of the U.S. Constitution.
Plaintiffs argue that a regulation which incidentally affects

interstate commerce runs afoul of the Commerce Clause if "the
burden imposed upon such commerce is clearly excessive in
relation to the putative local benefits." Pike v. Bruce Church,
397 U.S. 137, 142 (1970) (citation omitted).  Plaintiffs argue
that the City has created a monopoly over the market for
government services.

Plaintiffs have failed to show that IRNE imposes an
excessive burden on interstate commerce.  As noted, IRNE commands
only a fraction of the Portland market for telecommunications
services.  I grant the City's motion for summary judgment on
plaintiffs' Commerce Clause claim.

**VI.  Other Claims**

Plaintiffs also bring claims for a takings in violation of
the Fifth Amendment, violations of due process, and unjust
enrichment.  I grant the City's motion for summary judgment on
these claims.

Although I conclude that the in-kind provision in TWT's
agreement and the most-favored-rate provisions in both agreements
are preempted, neither plaintiff had property taken without due
process as a result of these provisions.  The City never tried to
exercise its rights under the preempted provisions.

Given this court's rulings on plaintiffs' other claims, I
grant summary judgment on plaintiffs' unjust enrichment claim.

## THE CITY'S MOTION FOR SUMMARY JUDGMENT

The City seeks summary judgment on its counterclaims against TWT and QCC for alleged breaches of agreements with the City.

## I.  City's Claims Against TWT

The City contends that TWT has failed to pay all of the fees due under the franchise agreement.  The franchise agreement requires that TWT pay the City a fee equal to 5% of TWT's gross revenues earned from telecommunication services in the City.  The City contends that TWT is unilaterally excluding revenues that TWT earns from "information services."  The City contends that these excluded services should be considered "telecommunication services" that are covered by the franchise agreement.

The franchise agreement provides that "gross revenues" are derived from "the provision of Telecommunications Services."  TWT Franchise, § 3.1.  The agreement defines "telecommunications services" in part as "[s]ervices interconnecting any entities, other than interexchange carriers, competitive carriers, or telephone companies providing local exchange services, for the purpose of voice, video, or data transmission."  TWT Franchise, § 2.11(D).  It also includes a catch-all definition:  "Other telecommunications services as authorized by the Federal Communications Commission or the Oregon Public Utility Commission."  Id., § 2.11(F).

I conclude that material issues of fact preclude granting

33 -- OPINION

summary judgment on the City's counterclaim against TWT.  The
City has not shown as a matter of law that TWT breached the
franchise agreement by excluding revenues from information
services.

## II.  City's Claims Against QCC

The City contends that QCC breached three provisions of its
franchise agreement with the City.

First, the City contends that under section 9.1 of the QCC
franchise agreement, QCC was to build underground ducts for the
City, and to provide the City with "a deed or other form of
documentation indicating City ownership of such ducts."
According to the City, QCC built the duct but never provided the
City with deeds.

The City contends that section 9.2 of the franchise
agreement with QCC required QCC to "install two . . . ducts for
the City across the Ross Island Bridge" and provide the City with
a deed for the duct.  According to the City, QCC constructed the
duct but has not provided a deed.

The City also contends that QCC has denied the City access
to ducts that it installed for the City across the Ross Island
Bridge.  The City states that QCC built two small ducts inside a
QCC conduit.

I grant the City's motion for summary judgment on its
counterclaims against QCC, while reserving the question of the

34 -- OPINION

amount of damages.    Because I have concluded that the in-kind compensation provisions in QCC's franchise agreement are valid, QCC's failure to comply with those provisions breached the agreement.

### CONCLUSION

Plaintiffs' motion for summary judgment (#76) is granted as to the in-kind compensation provision in TWT's franchise agreement, and the most-favored-rate provisions in both franchise agreements, and otherwise denied.    The City's motion for summary judgment (#82) is granted, except as to TWT's in-kind provision and the most-favored-rate provisions, and the City's counterclaim against TWT.

The City's motion to strike (#121) is denied as moot.

DATED this ___ day of March, 2006.

_____
OWEN M. PANNER
U.S. DISTRICT COURT JUDGE